In re MONARCH CAPITAL
CORPORATION,
Debtor.

Harrison J. GOLDIN, Chapter
11 Trustee, Plaintiff,

v.

PUTNAM LOVELL, INCORPORATED,
Defendant.

Bankruptcy No. 91–41379–JFQ.
Adv. No. 92–4041.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 8, 1994.

Douglas W. Salvesen, Choate, Hall & Stewart, Boston, MA, for Harrison J. Goldin, Trustee.

John J. Rosenberg, Varet, Marcus & Fink, Boston, MA, for Putnam Lovell, Inc.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

This dispute arises as a result of the uncertain status of an executory contract prior to its assumption or rejection. Presented are issues of unjust enrichment. Putnam Lovell, Incorporated ("Putnam Lovell") has filed a claim, later amended, in the sum of $210,000, for which it asserts an administrative expense priority under section 507(a)(1) of the Bankruptcy Code. Alternatively, Putnam Lovell seeks a gap-period priority under section 507(a)(2) for a portion of the claim. Objection is lodged by Sovereign Realty Company, Inc., which is the representative of the bankruptcy estate of Monarch Capital Corporation (the "Debtor") and successor to the chapter 11 trustee. The parties have filed cross motions for summary judgment. I deny both motions and set forth here find-

ings of fact and conclusions of law that will govern a restricted evidentiary hearing.

## I. FACTS

The facts are largely uncontested. Prior to its chapter 11 proceeding, the Debtor was a holding company with subsidiaries engaged in insurance and other financial services as well as real estate development and management. Among its holdings was an 85% stock interest in Associated Capital Investors, Inc. ("Associated"). Associated was a money management firm located in San Francisco.

In late 1990, Private Capital Partners ("Private Capital") approached the Debtor with an unsolicited proposal to acquire Associated. The Debtor retained Putnam Lovell, an investment banking and business brokerage firm, to pursue the proposal. On December 17, 1990, Putnam Lovell sent a letter to the Debtor setting forth the terms of their agreement, which the Debtor signed on January 21, 1991.

Under the letter agreement, the Debtor appointed Putnam Lovell its "exclusive financial advisor" to effect a sale of Associated. As compensation, Putnam Lovell was to receive a so-called "success fee" based upon a percentage of the sales price (e.g., 3% on the first $10 million), but in the minimum amount of $200,000. Putnam Lovell was also to be reimbursed for its travel and other specified expenses. Advances on the success fee were to be payable only "[w]hen, as and if agreed." The fee was payable with respect to "any" sale conducted during the term of the agreement or within two years thereafter. The term of the agreement was for one year beginning December 17, 1990, subject to automatic extension for consecutive 90 day periods absent a written notice of termination from either party.

Putnam Lovell pursued a sale to Private Capital. The form of the proposed transaction gradually changed from a sale to Private Capital to a sale to Associated's management through Private Capital. The parties signed a purchase and sales agreement. But the management of Associated was unable to put together the financing. On the advice of Putnam Lovell, Monarch terminated the purchase and sales agreement effective May 31, 1991.

In May of 1991, Putnam Lovell requested the Debtor to pay it a $100,000 advance on its commission, but the Debtor did not do so because of its increasing financial difficulties. During this period Associated paid some of Putnam Lovell's expenses.

The Debtor was involved in a number of real estate ventures through various subsidiaries. The downturn in real estate values in New England had a disastrous effect on these investments. The Debtor attempted to support its collapsing empire with funds from its principal subsidiary, Monarch Life Insurance Company. On May 30, 1991, the Massachusetts Commissioner of Insurance petitioned Monarch Life Insurance Company into receivership under the supervision of the Supreme Judicial Court of Massachusetts. On the same day, the Commissioner and two other parties filed a petition in this court requesting entry of an order for relief under chapter 11 against the Debtor.

Putnam Lovell was concerned about the effect that the bankruptcy filing would have upon its ability to be paid for its ongoing services. On June 4, 1991, Donald H. Putnam of Putnam Lovell telephoned the Debtor's president, Roger Servison, to discuss the matter. On June 4, 1991, Mr. Putnam wrote a letter to Mr. Servison which is quoted in full later in this opinion.

On June 20, 1991, with the consent of the Debtor, I entered an order for relief under chapter 11. At the request of the parties, I also authorized the appointment of a trustee, and on July 16, 1991 I approved the appointment of Harrison J. Goldin, Esq. (the "Trustee") as chapter 11 trustee.

In the meantime, Putnam Lovell had continued its efforts to sell Associated. On June 21, 1991, Mr. Lovell met with Arthur Trueger, who was chairman and chief executive officer of both Berkley International Capital Corporation ("Berkley") and its affiliate, Berkley Govett (USA) Holding Limited ("Berkley Govett"). Both companies were engaged in international financial services. Mr. Lovell proposed that Berkley Govett ac-

quire Associated. That meeting led to no immediate results.

During June, Putnam Lovell contacted Weiss, Peck & Greer ("Weiss Peck"), a New York investment management firm. On July 1st, Weiss Peck made an offer to purchase Associated for $500,000. Mary Pat Thornton, a Putnam Lovell partner, met with the Trustee in New York City on July 23, 1991 to discuss the offer and acquaint the Trustee with Putnam Lovell's arrangement with the Debtor. The Trustee asked Ms. Thornton to try to get Weiss Peck to increase its offer. The Trustee did not say anything to Putnam Lovell, on that or any other occasion, about whether he would assume or reject the contract.

The Trustee decided to reject the Putnam Lovell contract soon thereafter. On August 9th, he filed a motion to do so, which the court allowed without opposition on August 20th. On August 6th, the Trustee retained Rogers, Casey Manager Service, Inc. ("Rogers, Casey"), subject to court approval, to assist him in the sale of Associated. The Trustee took these actions in the good faith belief that rejection of the Putnam Lovell contract was in the best interests of the estate. In contrast to the Putnam Lovell contract, the Trustee's agreement with Rogers, Casey did not obligate the bankruptcy estate to a large minimum fee. It provided for a flat $25,000 payment, plus a contingent fee of 2% of the price of any sale initiated during the agreement's six month term.

The Trustee was not aware at the time that Berkley was a potential purchaser. Putnam Lovell had furnished him with a list of "Potential Buyers—Active" and "Bidders—Inactive." Neither Berkley nor Berkley Govett was on the list.

In early August of 1991, Ms. Thornton of Putnam Lovell telephoned Michael J. Mayer, president of Berkley, soliciting Berkley's interest in purchasing Associated. Mr. Mayer responded that in 1989 Berkley had considered and rejected the purchase because Berkley was dissatisfied with Associate's management. When Ms. Thornton told him new management was in place, he expressed some interest. Ms. Thornton suggested he telephone Associated directly, giving him the

name of Associated's president. She asked him to sign a confidentiality agreement, which he agreed to do. Mr. Mayer telephoned Associated's president shortly after signing the confidentiality agreement on August 8th. Mr. Mayer thereafter spoke to the Trustee. The Trustee instructed him to work with Rogers, Casey rather than Putnam Lovell, and Berkley thereafter did so.

Rogers, Casey went to work immediately. It solicited and received formal purchase offers from Berkley and other parties. Its efforts eventually focussed on Berkley. It engaged in extensive negotiations with Berkley, which resulted in Berkley increasing its offer. On December 11, 1991, Berkley signed an agreement to purchase Associated's assets. In addition to a flat price of $672,947.70, Berkley promised to make further payments contingent upon Associated's future profits. The Trustee estimates that this so-called "earn-out" portion of the sale is worth about $900,000, bringing the total price to $1,572,947.70. Based upon this price, the additional 2% commission of Rogers, Casey would come to about $31,450, making its total fee $56,450, significantly less than the $200,000 Putnam Lovell fee.

## II. SUMMARY OF LEGAL ISSUES

The Trustee appears to concede that Putnam Lovell is entitled to a nonpriority claim of $210,000 as damages for the breach flowing from rejection of the Debtor's obligation under the parties' letter agreement of January 21, 1991. That agreement entitled Putnam Lovell to a minimum $200,000 fee, plus expenses, in the event of "any" sale of Associated taking place during the term of the agreement or within two years thereafter. It imposed no requirement that Putnam Lovell be the efficient cause of finding the eventual buyer.

Putnam Lovell's prime contention is that it has a $210,000 first priority claim under section 507(a)(1). As an alternative argument, Putnam Lovell asserts that a portion of its claim is entitled to a second priority under section 507(a)(2) as a section 502(f) "gap" claim. I turn to the latter contention first because it relates to earlier events.

### III. PUTNAM LOVELL'S SECTION 502(f) "GAP" CLAIM

■ Putnam Lovell's section 502(f) claim relates to the services it rendered between May 30, 1991, the date of the involuntary filing, and June 20, 1991, when an order for relief under chapter 11 was entered. During that period, Putnam Lovell says, it rendered services worth $40,550, based on its standard hourly rates, and incurred expenses of $6,349.14.

Section 502(f) of the Code authorizes allowance in an involuntary case of

a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and the order for relief ...

Putnam Lovell bases its section 502(f) claim upon the telephone conversation of June 4th between Donald H. Putnam and Roger Servison, the Debtor's president. Putnam Lovell contends: (i) In this conversation Mr. Servison obligated the Debtor to pay Putnam Lovell for services performed thereafter at its standard hourly rates, as an advance on its success fee, and (ii) Mr. Servison did so in the ordinary course of the Debtor's business. I disagree with both contentions.

In his affidavit, Mr. Putnam states that Mr. Servison said only the following when Mr. Putnam raised the question of payment for current services:

Mr. Servison responded by informing me that there were procedures in place in the bankruptcy for the payment of professionals working on the Associated acquisition and other transactions in which Monarch was involved and that those procedures would apply to Putnam Lovell if it continued to provide services in connection with the Associated acquisition.

In saying this, Mr. Servison did not purport to obligate the Debtor to pay for the current services of Putnam Lovell at its hourly rates, as an advance on its success fee. To the contrary, he was recognizing that the Debtor's obligation was contingent upon "procedures in place in bankruptcy for the payment of professionals...." Once an order for relief is entered, those procedures require court approval for assumption of an executory contract. 11 U.S.C. § 365(a) (1988). They also require court authorization for the employment of a professional. 11 U.S.C. §§ 327, 328 (1988).

In his deposition, Mr. Servison confirms he made it clear to Putnam Lovell that he needed the consent of others before the Debtor was bound to any arrangement with Putnam Lovell. He said:

I think what I told them that was—we wanted them to go forward, and that as long as I had authority on behalf of the corporation, that the board and the secured creditors agreed that we wanted them to go forward. I believe I also advised them that we had not yet decided what our response to the bankruptcy petition could be and what that might mean for the future of Monarch or for the future of their relationship with Monarch.

Putnam Lovell stresses that Mr. Servison nevertheless authorized it to continue doing work for the Debtor. That is true. Mr. Servison in his deposition states: "I think what I told them was—we wanted them to go forward...." But Mr. Servison is obviously referring to Putnam Lovell going forward under the terms of its contract. That contract provided for a success fee contingent upon a sale. Under its terms, advances on the success fee were payable only if the Debtor consented. Significantly, only a month or so before, Putnam Lovell had been unable to obtain an advance because of the Debtor's financial difficulties. In the meantime, a bankruptcy filing had occurred. Mr. Servison's intent not to agree to an hourly payment arrangement becomes even clearer when the conversation is viewed in this context.

At most, Mr. Servison acceded to Putnam Lovell's request that it be permitted to submit monthly bills based upon the time spent and that these bills would be subject to "procedures in place in the bankruptcy." Mr. Putnam's letter to Mr. Servison of June 4th confirms this. That letter, to which Mr. Servison did not respond, reads as follows:

Dear Roger:

In our conversation today, you and I agreed as follows regarding Putnam Lovell's work on project Signal:

- You will confirm that our current contract, as amended, continues to govern.
- We will separately invoice expense reimbursements incurred prior to June 1, 1991.
- Monthly, Putnam Lovell will bill Advances at its normal hourly rates (see enclosed policy) as incurred beginning June 1, 1991.

We continue to actively work on the sale of Associated Capital, to Private Capital partners or another buyer/investor. Based on our conversation today, our efforts shall continue unabated.

Sincerely,

The June 4th conversation did not, therefore, constitute a contract obligating the Debtor to pay for services rendered after June 1. Moreover, the bill submitted by Putnam Lovell on June 26, 1991 is not confined to services rendered and expenses incurred during the gap period of May 30th to June 20th. Six days of services on that bill are outside the gap period. There are also numerous expenses included in the $6,349.14 charge that were incurred prior to May 30th.

■ Nor does the June 26th bill represent "a claim arising in the ordinary course of the debtor's business," within the meaning of section 502(f). The Debtor's bankruptcy filing prompted Mr. Lovell's call of June 4th. In his own words, he was "concerned as to the effect that the bankruptcy filing would have upon Putnam Lovell's efforts to further the Associated asset sale, and insurance of the firm's future role in the matter (including its ability to receive payment)." A claim arising from a payment arrangement prompted by a bankruptcy filing against a debtor hardly arises in the ordinary course of a debtor's business. *In re Manufacturer's Supply Co., Inc.*, 132 B.R. 127 (Bankr. N.D.Ohio 1991) (debt for loan needed to pay fee for legal services required by bankruptcy filing not a debt arising in ordinary course of debtor's business). Mr. Servison's insistence upon payment according to bankruptcy procedure confirms this. So too does the fact that he was, as he says in his deposition, "scripted" by lawyers on what to say in such conversations. Thus the claim would not qualify under section 502(f) even if Mr. Servison purported to make an outright commitment on behalf of the Debtor.

■ The claim, moreover, arose in connection with another transaction which was not in the ordinary course of the Debtor's business—the sale of a subsidiary. The extraordinary nature of such a sale seems obvious. Mr. Servison confirms this in his deposition. Despite attempts to lead him the other way by counsel to Putnam Lovell, he would say only that the sale of a subsidiary "took place from time to time." The out-of-the-ordinary course nature of the transaction does not change because of the relatively small value of Associated compared to the value of the Debtor's total holdings.

### IV. PUTNAM LOVELL'S FIRST PRIORITY CLAIM UNDER SECTION 507(a)(1)

■ Section 507(a)(1) of the Code grants first priority to "administrative expenses allowable under section 503(b)...." Section 503(b), in turn, provides for the allowance of various expenses as administrative expenses, including

(1)(A) The actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case; ....

The present case was commenced as an involuntary case on May 30, 1991. The order for relief under chapter 11 was entered on June 20th. In including expenses incurred "after the commencement of the case," section 503(b)(1) might be read to include expenses incurred by the Debtor during the period between May 30th and June 20th. That it does not, however, is made clear by section 507(a)(2), which grants a second priority to claims incurred in the ordinary course of business during this "gap" period. Therefore, the question under section 507(a)(1) is whether the Debtor's bankruptcy estate incurred indebtedness to Putnam Lovell after entry of the order for relief on June 20th.

■ The purpose of granting a first priority to debts incurred after entry of an order for relief under chapter 11 is to induce parties to grant credit to the estate and thereby promote reorganization. *E.g., Woburn Associates v. Kahn (In re Hemingway Transport, Inc.),* 954 F.2d 1, 5 (1st Cir.1992); *United Trucking Service, Inc. v. Trailer Rental Co., Inc. (In re United Trucking Service, Inc.),* 851 F.2d 159, 161 (6th Cir.1988); *In re Jartran, Inc.,* 732 F.2d 584, 587–88 (7th Cir.1984); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950, 954 (1st Cir.1976); *In re Drexel Burnham Lambert Group Inc.,* 134 B.R. 482, 489, (Bankr.S.D.N.Y.1991). Thus there must generally be a *transaction* between the parties which creates contractual rights against the estate.[1]

The First Circuit has phrased this postpetition contractual requirement in the form of a two-part test:

As a general rule, a request for priority payment of an administrative expense pursuant to Bankruptcy Code § 503(a) may qualify if: (1) the right to payment arose from a postpetition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor. *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d at 954; *Woburn Associates v. Kahn (In re Hemingway Transport),* 954 F.2d at 5 (1992).

The First Circuit's decision in *Mammoth Mart* is instructive on the application of this two-part test. The court there dealt with first priority claims for unpaid severance pay filed by employees whose employment was terminated by the debtor after the filing of the debtor's voluntary petition. The debtor's prepetition policy had been to pay one week's salary for each year of employment. The amounts of the claims before the court were calculated based upon prepetition years of service. The court denied priority because the consideration supporting the claims consisted of services performed prepetition. The court distinguished that type of severance pay arrangement from one in which the amount claimed is based upon the employee's salary at the time of termination rather than years of service.

■ The bankruptcy estate, through the Trustee, entered into no contract with Putnam Lovell. The Trustee's dealings with Putnam Lovell were for the purpose of determining whether the estate should assume the Debtor's prepetition contract. The Trustee could impose an obligation on the estate *under that contract* only by assuming it, and he could assume it only with court approval. 11 U.S.C. § 365(a) (1988); *In re Providence Television Limited Partnership,* 113 B.R. 446, 452 (Bankr.N.D.Ill.1990). For the estate to employ Putnam Lovell independently of the contract, the Trustee would have to obtain court approval pursuant to section 327 governing employment of professionals. Thus there could be no contract binding upon the estate as the result of the Trustee's actions, express or implied, without court approval.

Putnam Lovell nevertheless contends that at its meeting with the Trustee on July 23rd the Trustee induced Putnam Lovell to continue with its services. In her affidavit, Ms. Thornton states the Trustee "directed" her to attempt to persuade Weiss Peck to improve its offer, and "directed" her "to have Putnam Lovell to [sic] continue with efforts to locate additional purchasers for Associated." In her letter of July 26th to the Trustee, she said: "Encouraged by you we continue to have discussions with other interested parties...."

The Trustee states in his affidavit:

---

1. Principles of fairness nevertheless require granting first priority to tort liabilities incurred by the estate representative in the process of reorganizing. *Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). This is on the theory that a reorganizing debtor should be held fully responsible for its activities. *Id.* Courts have used this same rationale to allow first priority for postpetition fines incurred by the operating debtor. *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.),* 755 F.2d 200 (1st Cir.1985). *See also Woburn Associates v. Kahn (In re Hemingway Transport, Inc.),* 954 F.2d 1 (1st Cir.1992) (first priority under *Reading Co. v. Brown* denied because activity of estate representative giving rise to claim was in course of liquidation rather than reorganization).

The meeting with Mrs. Thornton was purely informational, designed to familiarize me with the status of the sale of Associated. At no time during this meeting with Mrs. Thornton, or subsequently, did I attempt to persuade Putnam Lovell or encourage it to continue to provide services in connection with the sale of Associated.... In fact, the stated purpose of the meeting was to help me ascertain the value of the services being provided to the estate, so I could determine, in the exercise of my fiduciary duty as trustee whether the Debtor's pre-petition .contract with Putnam Lovell should be accepted or rejected.

There is, therefore, a question of fact concerning what was said at the July 23rd meeting. But the question is immaterial. As discussed, the Trustee could not have obligated the estate under any binding contract, express or implied, without court approval.

■ Principles of restitution, however, are different. Under these principles, all that Putnam Lovell need establish to recover the value of its services is that it rendered postpetition services pursuant to its prepetition contract, without objection by the Trustee, and that the services had value to the estate. An understanding of why this is the quantum of proof requires an understanding of the postpetition rights and obligations of the parties to an executory contract which has been neither assumed nor rejected.

■ The nondebtor party may not enforce an executory contract prior to its assumption or rejection. *NLRB v. Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). It follows from this proposition that the nondebtor party cannot terminate the contract by reason of the debtor's defaults thereunder. *Seacoast Products, Inc. v. Spring Valley Farms, Inc.,* 34 B.R. 379 (D.N.C.1983) (although debtor had defaulted prior to its bankruptcy filing, nondebtor could not, postpetition, terminate contract because of prepetition default); *Skeen v. Denver Coca–Cola Bottling Co. (In re Feyline Presents, Inc.),* 81 B.R. 623, 626 (Bankr. D.Colo.1988) (nondebtor could not terminate contract with debtor; nondebtor may only proceed under section 365(d)(2) for order requiring the debtor to make early election on whether to assume or reject). *See* Douglas W. Bordewiek, *The Postpetition, Prerejection, Pre–Assumption Status of an Executory Contract,* 59 Am.Bank.L.J. 197, 211–12 (1985). *See also, Hertzburg v. Loyal American Life Ins. Co. (In re B & K Hydraulic Co.),* 106 B.R. 131 (Bankr.E.D.Mich. 1989) (debtor could not assume life insurance contract postpetition which terminated under its own terms for failure to pay postpetition premiums).

■ The bankruptcy estate, on the other hand, can require the nondebtor to continue performance, so long as the estate performs. The Code spells this out only with respect to leases. Under section 365(b)(4), "the trustee may not require a lessor to provide services or supplies incidental to such lease [one in default] before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such leases."

■ In the present case, all that the Debtor was required to do under the parties' agreement, prior to the sale of Associated, was to reimburse Putnam Lovell for expenses. To require Putnam Lovell's continued services, the bankruptcy estate was obligated to do only the same. The expenses included in Putnam Lovell's bill of June 26th were mostly incurred before June 20th. Thus in not paying that bill the estate was not in default, so the Trustee had the right to require continued performance on the part of Putnam Lovell even prior to assumption. Putnam Lovell's remedy was to seek a court order limiting the time in which the Debtor had to assume or reject. See 11 U.S.C. § 365(d)(2) (1988).

■ Putnam Lovell nevertheless conferred a benefit upon the Debtor. Its telephone call to Berkley in early August caused Berkley to begin investigating a possible acquisition of Associated. If in doing this Putnam Lovell acted as a volunteer, Putnam Lovell would not be entitled to restitution, absent some emergency need for protection, which did not exist. *Restatement of Restitu-*

**908**

*tion* (1937) § 112 (no restitution for benefit conferred without mistake, coercion or duress except when conferred under circumstances making action necessary for protection of interest of recipient or another). *Peninsular & Oriental, Etc., v. Overseas Oil Carriers,* 553 F.2d 830, 834 (1st Cir.1977) (ship which came in aid of stricken seaman not a volunteer and thus entitled to restitution on grounds that services were immediately necessary to prevent injury and suffering), *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977).

■■■ But Putnam Lovell was not a volunteer. As we have seen, it was in the unenviable position of being bound to its contract and yet unable to obligate the estate under the contract to do anything other than pay expenses incurred after June 20th. The courts have recognized the unfairness of denying restitution in these circumstances. Decisions involving rent are the most common. It was well established under the Act that the lessor of an unexpired lease was entitled to the reasonable rental value of the premises during the postpetition period ending at assumption or rejection. *Philadelphia Co. v. Dipple,* 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651 (1941); *Reisenwebers, Inc. v. Irving Trust Co. (In re United Cigar Stores Co.),* 69 F.2d 513 (2d Cir.1934), *cert. denied,* 293 U.S. 566, 55 S.Ct. 76, 79 L.Ed. 665 (1934). This rule also applied to executory contracts generally. *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.,* 280 F.2d 119 (2d Cir.1960). The Act decisions recognized that this was an equitable right to recover the reasonable value of the benefits conferred rather than a contractual right to recover the contract price. *American Anthracite,* 280 F.2d at 124, *United Cigar Stores,* 69 F.2d at 515.

■■■ Except for rent,[2] the same rule applies under the Code. In *Bildisco,* the Supreme Court approved this principle as a corollary to its holding that an executory contract is unenforceable against the estate prior to its assumption. The Court stated:

If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor in possession is obligated for the reasonable value of those services ... which, depending on the circumstances of a particular contract, may be what is specified in the contract.... *Bildisco,* 465 U.S. at 531 [104 S.Ct. at 1199].

The First Circuit has also affirmed the nondebtor's right to restitution for benefits conferred prior to assumption or rejection, stating:

Here, where the debtor-in-possession made no new promise, but simply permitted the employees to continue their employment, it is bound to pay under the terms of the debtor's contract only to the extent that the debtor-in-possession was the recipient of beneficial services. *In re Mammoth Mart,* 536 F.2d 950, 955 (1st Cir.1976).

The present case is distinguishable from *In re Jartran,* 732 F.2d 584 (7th Cir.1984). The claimant there, an advertising agency, had contracted with the debtor prior to the filing to arrange for yellow-page advertising in numerous telephone directories published throughout the country. The claimant argued it was entitled to a first priority claim in the full amount of the contract price for the postpetition benefit conferred upon the debtor when the directories were published after the filing. The court denied priority on the ground the claimant had extended credit to the debtor before the date of the petition and the estate through the debtor had taken no affirmative action postpetition to enjoy the benefits of the advertising. In *Jartran,* however, the claimant performed substantial services prior to the filing, which conferred a postpetition benefit on the estate, when the claimant placed the advertising with local telephone companies. That is not so here. The entire benefit conferred by Putnam Lovell was accomplished through services performed postpetition when it interested Berkley in the purchase.

---

**2.** The landlords' lobby was successful in obtaining a special provision in the Code requiring the estate to pay the rent reserved in the lease, rather than fair rental value, during the pre-assumption, pre-rejection period. 11 U.S.C. § 365(d)(3) (1988).

■ I nevertheless disagree with *Jartran* in one respect. The claimant in that case provided some postpetition services which conferred a benefit upon the estate. After the filing date, it reviewed advertising copy and it responded to numerous inquiries about the advertisements from publishers. The claimant apparently did not ask the court, in the alternative, for partial priority in an amount equal to the value of these services. Nor did the court seem inclined to grant such partial priority. For an equitable right to exist, the court ruled, there must be a post-petition act or acceptance by the debtor, or an act electing to receive the benefit. *Id.* at 588. This view seems wrong. The equitable right at issue here is based upon unjust enrichment, not any act of acceptance or election.

## V. REASONABLE VALUE OF BENE-FIT CONFERRED BY PUTNAM LO-VELL

Rogers, Casey says it would have contacted Berkley in any event because of Berkley's prominence in the financial services industry. That may be. The fact remains that it was Putnam Lovell who initiated the contact, thereby setting in motion an unbroken chain of events leading to the sale.

Putnam Lovell claims the full contract price for having done this. As observed by the court in *Bildisco*, however, the estate's obligation is limited to paying the reasonable value of the services, "which, depending upon the circumstances of a particular contract, may be what is specified in the contract...." *Bildisco*, 465 U.S. at 531, 104 S.Ct. at 1199.

■ The question of the reasonable value of these services is a factual one and thus inappropriate for resolution through summary judgment. I will therefore set the matter down for trial on this limited issue.

■ A few preliminary observations are nevertheless appropriate as a guide to the conduct of the trial. Although the Putnam Lovell contract price would be evidence of value, it seems clear a reduction would have to be made to reflect the value of services Putnam Lovell did not fully perform under its contract. Putnam Lovell would have been required to expend considerable additional effort to bring the Berkley transaction to a close. In August of 1991, there were several potential buyers. Putnam Lovell's contract required it to "evaluate various potential transactions and capital structures...." Under the contract, Putnam Lovell also had to "negotiate and conclude ... the final form of the transaction [and] coordinate due diligence and related activities leading to the closing of the transaction." Even though Berkley was on the scene when Rogers, Casey was hired by the Trustee, Rogers, Casey was required to spend considerable time in dealing with Berkley and the other potential buyers.

Presumably, the Rogers, Casey contract would also be evidence of the reasonable value of the benefit conferred by Putnam Lovell. If the Debtor's estimate of the value of the Berkley transaction is correct, Rogers, Casey earned a fee of about $56,450, considerably less than the $200,000 claimed by Putnam Lovell.

In summary, the two contracts would appear to present evidence of the value of a benefit conferred by Putnam Lovell's postpetition services which ranges from $56,450 to a deeply-discounted $200,000.

■ Putnam Lovell's $10,000 expense claim will require a somewhat different consideration at trial. Only expenses incurred in making contact with Berkley after July 23rd appear to have conferred a post-June 20th benefit upon the estate. It may be, however, that the June 21st meeting with Berkley's chairman contributed to Berkley becoming interested in the acquisition. If so, these expenses would be entitled to a section 507(a)(1) priority. Even taken together, however, such expenses are presumably minimal. No other post-June 20th expenses are entitled to first priority claim.

■ That leaves for consideration expenses incurred by Putnam Lovell between May 30th and June 20th. The bill of $6,349.14 rendered by Putnam Lovell on June 26th includes many items which predate May 30th. Putnam Lovell is entitled to a second priority claim only for those expenses incurred in the gap period. The Debtor's

**910**

reimbursement obligation for these expenses was incurred in the ordinary course of business within the meaning of section 502(f).

The amounts for which Putnam Lovell is entitled to a first or second priority will be deducted from its total $210,000 claim. The balance will be allowed as a nonpriority claim.

Because further evidence is necessary, no separate order has issued. A three-hour trial is set down to begin on April 7, 1994 at 2:00 p.m.