**In the Matter of The TRAVELOT COMPANY, Debtor.**

No. 02–40020.

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

Aug. 8, 2002.

Order on Emergency Motion to Amend Aug. 20, 2002.

C. James McCallar, Jr., Savannah, GA, for Debtor.

Kathleen Horne, Savannah, GA, for Defendant/Respondent.

## *ORDER ON CNN'S MOTION TO COMPEL ASSUMPTION OR REJECTION OF AN EXECUTORY CONTRACT*

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

This matter requires a determination of the point at which a corporation in Chapter 11 must decide whether to assume or reject an executory contract which is that corporation's sole asset when both parties to the contract assert breach on the part of the other.

### *BACKGROUND*

The Travelot Company ("Travelot" or "Debtor"), a closely held corporation which developed a concept for providing enhanced web-based travel bookings, was party to an agreement ("the Contract")

with Turner Broadcasting Sales, Inc., an Agent and Affiliate of Cable News Network LP, LLLP ("CNN" or "Movant"). Under the Contract, Travelot was to provide online booking services and travel assistance to be offered on the "CNN.com" travel website. The targeted startup date was approximately ninety (90) days after the execution of the Contract, subject to CNN's final approval of the "content" and "functionality" of the Travelot product.

The Contract required Travelot to make a $750,000.00 "licensing fee" payment to CNN in three installments and an additional $250,000.00 advance advertising payment, none of which payments were contingent on prior implementation of the first phase of the contemplated undertaking. Travelot made no payments to CNN, and on January 2, 2002, prior to the deadline for payment of the final $250,000.00 installment, Travelot filed for Chapter 11 bankruptcy protection. Less than two weeks post-petition, Debtor owed CNN a total of $1 million.

The Contract was Travelot's sole meaningful asset. CNN challenged both the good faith of Debtor's filing and the Contract's assumability in a reorganization plan, contending that 11 U.S.C. § 365(c) operated to preclude its assumption. By Order entered June 14, 2002, this Court ruled that the filing was made in good faith and that the Contract was an executory contract, assumable by Debtor, subject to the requirements of § 365. CNN now moves the Court to set a pre-confirmation deadline for Travelot's decision to assume or reject the Contract. Travelot urges that it not be required to decide whether to assume until the date of confirmation.

This matter is a core proceeding within the jurisdiction of this Court under 28 U.S.C. § 157(b). In accordance with the requirements of Bankruptcy Rule of Procedure 7052(a), I make the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The parties to the Contract do not trust one another. Debtor suspects that CNN developed a case of buyer's remorse and prefers to contract for the services Travelot would have provided with different, more recognizable, and more financially substantial organizations such as Orbitz, Expedia, Travelocity, Priceline, or other well-known web-based travel booking companies. CNN believes that Debtor (1) breached its obligation to pay as much as $1 million under the terms of the Contract either prior to the filing of this Chapter 11 case or in the days immediately following the filing, (2) lacks the financial wherewithal to cure that default, (3) is incapable of performing under Phase One or Phase Two of the Contract, and (4) is using the bankruptcy process in a bad-faith attempt to restructure—not simply to assume—its contractual relationship.

The Contract was entered within a few days after October 1, 2001, most likely on October 4. Measuring the time frame set out for performance of Debtor's contract obligations from that date, the first payment of $250,000.00 was due on November 4, 2001, the second on December 15, 2001, and the third on January 15, 2002. In addition, Debtor was required to make the $250,000.00 advance advertising payment by January 1, 2002.

Phase One of the Contract, which included implementation of "booking engine functionality, hosting, fulfillment and customer service offerings for reservations and bookings for air, auto, and hotels," was contemplated to have been launched within ninety (90) days of the execution of the Contract, subject to quality control assurances that the product offered by Debtor would meet CNN's standards. *See* Con-

tract "Term Sheet" (attached to Declaration of Lewis Robert Isaacson, filed July 23, 2002) (hereinafter "Contract Term Sheet") ¶ 1.4. As a result, the parties had anticipated that a launch would have occurred no later than January 4, 2002, based on the execution date of the Contract; however, they did not fix an absolute deadline because they recognized the difficulty in getting a quality product online by a fixed and unalterable date. Because no grace period was granted Debtor in making any of the installment payments based on any delay in the launch date, the essence of the agreement was that Debtor agreed to pay $1 million in advance of receiving access to CNN's websites.

As explanation for its nonpayment, Debtor asserts that CNN failed to meet a November 1, 2001, deadline for providing a media plan to Debtor and failed to make a timely pre-petition response to Debtor's timely submitted mockups which illustrated the expected look-and-feel of Debtor's product as it would appear on CNN's website.

In the post-petition period, the parties unsuccessfully attempted to negotiate during a thirty-day period during which they requested a stay in these proceedings. Throughout the post-petition period, both parties have continued to delay meeting their obligations under the Contract. Debtor has not tendered any funds to CNN to reduce the $1 million obligation which was due in its entirety no later than January 15, 2002. CNN failed to provide anything qualifying as a media plan prior to March 14, 2002, see Def.'s Ex. 1 (email and attachment from Aaron Dalin to Issacson), and failed to make any response to the proposed mockups submitted by Debtor in November 2001 until July 9, 2002, see Def.'s Ex. 5 (email and attachment from David Payne to Isaacson).

Also during the post-petition period, CNN has been displaying links to travel websites of some and perhaps all of the four companies with which it had contractually agreed "not to place booking functionality," see Contract Term Sheet ¶ 5.1. Debtor strenuously argues that the placement of interactive links to these four companies' websites where consumers can book travel is a direct violation of the Contract. CNN contends that even though website visitors are able to book travel reservations through the CNN.com links to those four companies, CNN retained the right to do so in paragraph 5.1 in the Contract Term Sheet which provides in relevant part:

> CNN agrees not to place booking functionality from Orbitz, Travelocity, Expedia or Priceline on the CNN Sites; however, CNN reserves the absolute right to use content from other sources and will retain absolute editorial discretion with regard to its selection and use of any and all content on the CNN Sites, including the Travel Content.

The Contract does not clearly define the terms "functionality," "booking functionality," or "travel content."

On or about July 26, 2002, Debtor, asserting various ways in which CNN allegedly breached the Contract, filed a civil lawsuit against CNN in the Superior Court of Chatham County, Georgia.

CNN, insisting that it is being deprived of business opportunities to seek a qualified alternative source for providing the goods and services which Debtor would have provided in that it cannot contract with such another partner so long as the possibility of a Court-ordered assumption of the Contract remains, urges this Court to compel Travelot to immediately move to assume or reject the Contract. Because of the mutual atmosphere of distrust and because Debtor contends that CNN has ma-

terially breached the Contract in numerous ways, Debtor argues that it should not be forced to make a pre-confirmation decision concerning acceptance or rejection of the Contract.

### CONCLUSIONS OF LAW

■ A Chapter 11 debtor-in-possession may assume or reject an executory contract "at any time before the confirmation of a plan," but the bankruptcy court is empowered with discretion to establish an earlier deadline for such decision. *See* § 365(d)(2); *Data–Link Sys. Inc. v. Whitcomb & Keller Mortg. Co., (In re Whitcomb & Keller)*, 715 F.2d 375, 379 (7th Cir.1983); *In re Monroe Well Serv., Inc.*, 83 B.R. 317, 323 (Bankr.E.D.Pa.1988) (stating that court has "broad discretion"). Any shortened time period should be calculated so as to afford the debtor-in-possession reasonable time to determine whether assumption would be beneficial to a successful reorganization, *In re Whitcomb & Keller*, 715 F.2d at 379, and thus consistent with the broad purpose of Chapter 11 to permit successful rehabilitation of debtors, *In re Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J.1986) (citing *NLRB v. Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)). To that end, "[i]t is vitally important to *all* interested parties that the debtor make a prudent assumption or rejection decision, particularly a decision to assume," *In re Wheeling–Pittsburgh Steel Corp.*, 54 B.R. 385, 388 (Bankr. W.D.Pa.1985) (emphasis in original).

■ During the pre-assumption period, although non-debtors are required to perform in accordance with a contract, *e.g., Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., Inc., (In re Pub. Serv. Co. of N.H.)*, 884 F.2d 11, 14 (1st Cir.1989) ( stating that pending decision to assume or reject, "the executory contract remains in effect and creditors are bound to honor it"), the con-

tract's terms are "temporarily unenforceable against the debtor," *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1075 (3d Cir.1992) (citing *Bildisco*, 465 U.S. at 532, 104 S.Ct. 1188); *accord, e.g. United States v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 624 (8th Cir.1994); *McLean Indus., Inc. v. Med. Lab. Automation, Inc., (In re McLean Indus.)*, 96 B.R. 440, 449 (Bankr.S.D.N.Y.1989). A debtor-in-possession which "elects to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract" must, nevertheless, pay for the reasonable value of those services. *Bildisco*, 465 U.S. at 531, 104 S.Ct. 1188 (noting that those services, "depending on the circumstances of a particular contract, may be what is specified in the contract"); *see also Goldin v. Putnam Lovell, Inc. (In re Monarch Capital Corp.)*, 163 B.R. 899, 907–910 (Bankr.D.Mass. 1994) (holding that non-debtor party was entitled to reasonable value of services actually conferred on debtor during postpetition, pre-assumption/rejection period).

■ Debtor's resistance to the instant Motion to Compel is based on the notion that, especially in light of CNN's alleged breach in permitting interactive links to Orbitz, et.al., on the CNN website, the Court should not shorten the time during which Debtor may determine whether to assume or reject. The alleged breach relates to paragraph 5.1 in the Contract Term Sheet, which forbids CNN from placing "travel booking functionality" from certain of Travelot's competitors. Debtor asserts the links to Orbitz, et. al., on the CNN website constitutes placing "booking functionality" which the Contract forbids. CNN contends that "booking functionality" encompasses only interactive travel booking space which is "branded" by CNN and contained in the noncommercial portion of CNN's travel webpages, and that any in-

teractive link to a webpage clearly identified as being offered by Orbitz et.al., is something other than "booking functionality." This, asserts CNN, is permitted under the terms of the Contract, in which CNN reserved the absolute right to use such "content" from sources other than Travelot. *See* Contract Term Sheet, ¶ 5.1.

The essence of the dispute between the parties is whether "content"—which CNN contractually reserved the right to place on its website from sources other than Travelot—encompasses only "static" displays or whether it includes the possibility of interactive links to other websites. In other words, does the Contract permit CNN only to place advertisements or feature articles that include promotional material and reference the user to toll-free telephone numbers and to web addresses which the user must access by dialing a telephone or typing in a URL address, or does the Contract permit the content to be interactive, as opposed to static, whereby the user may click on a display placed by Orbitz, et al., and be automatically linked to the Orbitz site where on-line booking can take place?

The Court realizes that the issue of whether the Contract has been breached will ultimately be decided by a state court of competent jurisdiction because of Travelot's recent filing of a lawsuit against CNN alleging such breach. Nevertheless, it is a relevant factor for this Court to consider whether, for the purposes of this Motion only, CNN has breached. If the Court were to construe the Contract in accordance with Travelot's belief that CNN merely reserved the right to display "static" content from sources other than Travelot, then there is a substantial likelihood that CNN has breached a material provision of the parties' contract in the post-petition period. That likelihood would be a factor weighing heavily in Travelot's favor when it argues that it should not be forced to make a decision whether to assume or reject this contract at a time when CNN has engaged in a pattern which constituted a material breach. If, however, the Court were to adopt CNN's position, the issue of material breach would not impact my decision.

The parties were afforded the opportunity to cite to the Court any learned treatises or scholarly articles which discuss these concepts and place them in some context for the purpose of the Court's decision. Both parties filed briefs containing helpful, but not dispositive, information.

The starting point is ordinary English usage. "Functionality" is defined in the Webster's Dictionary as "the quality, state, or relation of being functional," Webster's 3d New Int'l Dictionary 921 (1986), and "functional" is, in turn, defined as "designed or developed chiefly from the point of view of use ... relating directly to everyday needs and interests: concerned with application in activity ... performing or able to perform its regular function," *id.* "Content" is defined as "something that is contained" and as "the topics, ideas, facts, or statements in a book, document, or letter." *Id.* at 492. Applying only these dictionary definitions, it appears that "content" refers to anything which appears on a webpage that can be read or observed by a visitor to the website, whereas "functionality" refers to "content" which is or can be used to do something.

Further examination and analysis of various provisions of the Contract, however, reveal that the scope and understanding of "content" and "functionality" are more specialized within the context of this case. An examination of the Contract reveals:

1) The September 25, 2001, cover letter from Turner Broadcasting Sales, Inc., to Travelot refers to the contract as "Travel Content Acquisition Agreement." Within

the four corners of the contract bearing this title, the parties make various provisions for the use and placement of travel content and the use and placement of "booking functionality," "travel booking functionality," and "booking engine functionality."

2) In paragraph 1.1 of the Contract Term Sheet, CNN makes Travelot its "premier" provider of travel booking functionality. In return, Travelot gives CNN a nonexclusive right to display its "travel booking functionality" *and* "travel and travel related content" (including "navigation"). This language is suggestive that "travel booking functionality" and "content" are separate products, but how they are differentiated does not depend on static or interactive displays, because content can include navigation.

3) Paragraph 5.1 provides for exclusivity to the extent that CNN agrees not to place booking functionality from Orbitz, et.al., on the CNN sites, but reserves the absolute right to use content from "other sources" which presumably include the four named entities. Paragraph 1.5 provides that CNN retains the right to test "travel content" prior to the launch of either or both phases of the Contract's implementation. If travel content were limited to static displays and did not include interactivity, there would not be any reason for its being tested, and the parties presumably would have used the term "booking functionality" in lieu of "travel content" in paragraph 1.5.

4) Paragraph 3.1 provides that Travelot agrees that its travel "content" will have "certain CNN navigation and branding." Again, since the Contract provides that Travelot will provide both "travel booking functionality" and "content" to CNN and because the travel "content" is contemplated to have certain CNN navigation fea-

tures, it seems clear that "content" is not static, but includes interactivity.

These provisions reveal that, notwithstanding the dictionary definitions which suggest that "content" is static and that "functionality" alone encompasses some degree of interactivity, travel "content" can in fact encompass navigation and interactivity and not mere static advertising displays. Accordingly, I conclude, for the purposes of this Motion, that when CNN reserved to itself the right to place travel "content" from companies other than Travelot on its website, it retained the right to place interactive links from Orbitz, et.al., to the clearly identified websites of Orbitz, et.al. CNN's inclusion of Orbitz, et.al., links to non-CNN websites for booking online travel has not been shown to constitute a breach by CNN of the Travelot contract. Other alleged breaches by CNN are relevant, but not dispositive.

Since the most urgent reason given by Debtor to delay the time for assumption or rejection has not been established, it is necessary to decide this motion in light of the mandate of *Whitcomb & Keller*, 715 F.2d at 379, that any decision to shorten the time should be reasonably calculated to afford Debtor sufficient time to make a prudent decision. Notwithstanding the reasonableness of Debtor's fears that CNN may not perform, this Court can neither provide comfort to Debtor on that point nor compel the parties to perform. The Contract, as Debtor has so eloquently argued in the past, is the essence of Debtor's entire business. Whether to assume the Contract is not the typical isolated question faced by many Chapter 11 debtors who are called upon to determine which employment contracts to assume and which to reject, or which leases of shopping center space or rolling stock to assume and which to reject, as part of a larger comprehensive Chapter 11 plan.

The Contract is the sole purpose for Travelot's existence and for its presence in this Chapter 11 reorganization proceeding.

I conclude that Travelot shall not be permitted to delay until the date and time of confirmation in order to accept or reject the Contract. Prolonging the suspense will not serve the purposes of Chapter 11. Travelot has all the facts before it and now must make a decision. If it chooses to assume and the Court orders assumption and CNN fails to perform, Debtor may have the ability to pursue a cause of action against CNN rather than to pursue an ongoing business relationship. If, on the other hand, Debtor is uncertain regarding its own financial wherewithal or desire to go through with the Contract with a reluctant contracting party, then Debtor may move to reject the Contract.

This case has been pending for well over six months, and Debtor's exclusivity period has expired.[1] No disclosure statement has been filed, and no plan has been proposed. Debtor has minimal funds in the bank—probably less than $100.00—and is in default at this moment in the amount of $1 million, yet, in the past several months, Debtor has not visibly undertaken to raise the necessary capital—the most minimal of preconditions which the Court would place on any order granting a motion to assume. Debtor's principal testified in February and again at this hearing that if Debtor chose to assume, venture capital sufficient to cover its obligation to CNN could be raised in a relatively short period of time. The time has come for Debtor to act one way or the other. To assume, Debtor must promptly cure any default and provide adequate assurance of future performance. *See* § 365(b)(1). Gleaning whether a debtor's assurance of future performance is "adequate" is at times an elusive, ethereal, concept. But determining what is necessary to cure an existing default is concrete and identifiable. That cure amount is $1 million. If Debtor lacks the will or the wherewithal to cover that default, there will be no need to resolve any dispute over whether its assurances of future performance of other obligations under the Contract are "adequate."

### ORDER

Pursuant to the above, IT IS THE ORDER OF THIS COURT that The Travelot Company file a Motion to assume or reject the Contract not later than August 23, 2002. IT IS FURTHER ORDERED that Travelot deposit in the registry of this Court the sum of $1 million on or before August 23, 2002.

If The Travelot Company fails to make said deposit or fails to file a Motion to assume or reject on or before August 23, 2002, the Contract will be deemed rejected and the Court will enter a brief order to that effect. If the deposit is made and the Motion is filed on or before August 23, 2002, an evidentiary hearing to consider said Motion will be scheduled for hearing at 10:00 o'clock a.m., on September 4, 2002.

### ORDER ON DEBTOR'S EMERGENCY MOTION TO AMEND COURT'S ORDER OF AUGUST 8, 2002

The Travelot Company ("Debtor") filed its Chapter 11 case on January 2, 2002.

---

1. A Chapter 11 debtor is granted an exclusivity period—measured 120 days from the day the order for relief is entered—during which time only the debtor-in-possession may file a plan. 11 U.S.C. § 1121(b). In this case, the exclusivity period was to have expired on or about May 2, 2002, but because the parties agreed to a thirty-day stay in these proceedings to pursue settlement at one point, the Court construes that stay as tolling the period of exclusivity; thus, I find that Travelot's exclusivity period expired on or about June 2, 2002.

On August 8, 2002, this Court entered an Order requiring Debtor, as a pre-condition to the Court's consideration of any motion to assume a contract with CNN, to "deposit in the registry of this Court the sum of $1 million on or before August 23, 2002." Order on CNN's Mot. to Compel, Ch. 11 286 B.R. 462, 469 (Bankr.S.D.Ga.2002). On August 15, 2002, Debtor filed an Emergency Motion seeking an amendment to that Order requesting that Debtor be permitted to provide collateral in lieu of cash in fulfillment of the Court's Order. The Motion asserts that Debtor has a partnership interest in and access to equity in other real estate owned by other shareholders in Debtor, and that the worth of those combined available sources is more than sufficient to guarantee ultimate payment of the sum of $1 million. CNN contends that, in light of earlier assurances made by Debtor that it was ready, willing and able to remit the sum of $1 million within a very short time frame, Debtor should not be permitted the opportunity of substituting anything less certain or liquid than cash pursuant to the Court's August 8 Order. On August 16, 2002, the Court convened a conference in chambers with counsel for the Debtor and counsel for CNN, and the Court has considered arguments presented by both counsel in support of and in opposition to said Motion.

At the conference, CNN's attorney correctly pointed out that Debtor's representative, Robert Isaacson, has given previous assurances to the Court that he was ready, willing, and able to deposit in the cash sum of $1 million within a very short time frame. As one example of Debtor's representations to the Court with respect to its ability to provide the $1 million, Debtor asserted in pleadings filed on its behalf with this Court on February 8, 2002, that it was "ready, willing, and able" to deposit $1 million in the registry of the Court within sixty (60) days of the order for relief which, based on a filing date of January 2, would have been on or about March 2, 2002. Debtor's Emer. Mot to Assume, para. 9 (Feb. 8, 2002); *see also* Resp. Br. of Debtor at 2 (July 23, 2002) ("The Debtor has access to sources of money, and remains ready, willing and able to pay all amounts legally required of it."); Aff. of Isaacson ¶ 42 (July 23, 2002) ("The Debtor in fact would have raised and paid [$750,-000.00] into escrow [in December 2001] had CNN not refused the offer. The Debtor remains ready, willing, and able to pay amounts legally required of it.").

Furthermore, in testimony before the Court on February 27 and 28, 2002, Debtor's representative, Mrs. Isaacson, testified that although Debtor did not at that moment have $1 million in case in order to cure the then existing arrearages owed to CNN under the contract, he had a ready source of cash available for the asking:

A. All I've done—and I've got a lot of assets in some properties in Atlanta that's got over $2 million in equity. And I've got a partner in there who is worth lots and lots of money. And all I've done—I haven't talked to any of them about properties or stocks, or anything like. All I've done is talk to him, and I said will you be able to get us the money because, we own the property in a general partnership. If I hypothecate my interest in that partnership, will you get the money, and can you get it relatively quick. And he says, yes, you know. We've got to get the legal works worked out. We've got to make sure that everything is free. But we've already done that.

Q. Did you start the process of drafting the legal work paper prior to today?

A. Yes.

Q. You have?

A. Yes.

Q. Is that in evidence? Have you shown the Court those papers today?

A. No.

Tr. of Hr'g, Feb. 27–28, 2002, at 358.

Finally, at the conclusion of the hearing before the Court on July 26, 2002, which resulted in the entry of the Court's Order of August 8, 2002, Debtor was specifically alerted by the Court to the fact that if the Court set a deadline earlier than confirmation for Debtor to file a motion to either assume or reject the contract with CNN, Debtor would be required to deposit sums necessary to cure the pre-petition default in the registry of the Court within a very short time frame, based on Debtor's previous representations of its ability to do so. As a result, Debtor was on notice that it needed to begin making arrangements beginning on July 26 to raise the necessary capital which the Court's Order later specifically directed be deposited by August 23.

As explanation for Debtor's difficulty obtaining cash prior to August 23, 2002, Debtor's counsel represented to the Court that Mr. Issacson represented to him that the necessary capital can be most quickly accessed only with the consent and active cooperation of an individual who is suffering from a serious illness and who, due to his current medical condition, has been hospitalized and unavailable for consultation since the hearing on July 16, 2002.

Taking all the previous testimony before this Court into account, as well as the representations of Debtor's counsel at the August 16 conference in chambers, I conclude that the Debtor has not made a showing that it would be appropriate to amend the previous Order so as to permit substitution of anything in place of cash. However, given the illness of the individual who was one of the primary sources for the Debtor's raising the necessary capital, and in order to permit Debtor some additional time to obtain the necessary capital from that individual or from alternative sources which he has represented to the Court are available, I modify my previous Order in the following respects:

1) Debtor shall be permitted, until 4:00 o'clock p.m., on August 30, 2002, to deposit in certified funds with the registry of this Court the sum of $1 million. If Debtor fails to make said deposit on or before 4:00 p.m. on August 30, 2002, the Court reserves the right to enter an Order either dismissing this case or finding that the contract with CNN is deemed rejected by Debtor's failure to take such action.

2) Debtor must file on or before 4:00 o'clock p.m., on August 30, 2002, a motion seeking either to assume or reject the contract with CNN. If Debtor fails to file such pleading, the Court reserves the right to enter an Order dismissing the case or finding that the contract is deemed rejected.

3) If Debtor makes a timely deposit and if Debtor timely files a motion to assume the contract, the Court will conduct a hearing to consider assumption, rejection, or any other appropriate relief on Monday, September 9, 2002, commencing at 10:00 o'clock a.m.