**In re ECONOMY LODGING SYSTEMS, INC., Debtor.**

**Bankruptcy No. 94–14144.**

United States Bankruptcy Court, N.D. Ohio.

Oct. 28, 1998.

---

Jeffrey C. Toole, Buckley, King & Bluso, Cleveland, OH, for Debtor.

Jonathan M. Yarger, Ellen Maglicic Kramer, Kohrman, Jackson & Krantz, P.L.L., Cleveland, OH, for The Beneke Company.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

The Beneke Company, Inc. ("Beneke") has filed two claims in this chapter 11 proceeding, an administrative expense claim of $50,212.50 and a general unsecured claim of $91,987.50, aggregating $142,200.00. Both claims arose out of an Estimating and Consulting Agreement between Beneke and the Debtor ("ELS") dated September 8, 1993 (the "Consulting Agreement"). ELS objected to both claims. The parties' dispute involves several agency, contract and bankruptcy issues which the parties have briefed and argued at length. These issues were tried before the Court on July 29 and 30, 1998. This Memorandum of Opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. This is a core proceeding under 28 U.S.C. § 157(a) and (b).

### Background

At the time the Consulting Agreement was entered into, ELS was a hotel franchiser and management company that franchised nearly 190 Knights Inn hotels throughout the United States and Canada. ELS owned three hotels and managed eight other hotels owned or operated by Economy Realty Services, Inc. ("ERS"), a corporation owned and controlled by the individuals who owned the controlling interests in ELS. These 11 hotels (hereinafter referred to as the "Hotels") were specifically identified in Addendum A to the Consulting Agreement.

The Consulting Agreement had its origin in the fact that the polybutylene plumbing systems installed in many structures had proved defective. DuPont Company and others had developed and marketed polybutylene as a less expensive substitute for copper and brass used for pipe and fittings in plumbing systems. Apparently, however, polybutylene plumbing systems were adversely affected by chlorine and heat resulting in damage to flooring, roofing and other structures caused by steam and water leakage. It is unclear from the testimony whether ELS called in Beneke after experiencing polybutylene plumbing problems or whether Beneke alerted ELS to the possibility of such problems based upon Beneke's polybutylene work.

Beneke is a property loss consultant based in Texas that had by 1993 acquired a national reputation as a leading expert on polybutylene plumbing systems. It had played an active role in negotiations with the Plumbing Claims Group, an organization of manufacturers and suppliers of polybutylene plumbing products established to handle polybutylene claims. The purpose of the Consulting Agreement was to enlist Beneke on ELS' behalf in prosecuting claims in respect of any of the 11 Hotels that had polybutylene plumbing. Under the terms of the Consulting Agreement Beneke undertook, among other things, "to locate, estimate and document . . . the loss and damage incurred by reason of faulty polybutylene plumbing systems" at the 11 Hotels.

The initial draft of the Consulting Agreement was prepared by Beneke and was finalized in negotiations during August 1993 with Frank Leonetti, Jr. ("Leonetti"), ELS Vice President and General Counsel. Beneke had done extensive work on polybutylene claims under the direction of James Moriarty, a Houston lawyer ("Moriarty"). On Beneke's recommendation ELS sought to retain Moriarty to press its polybutylene claims, but Moriarty was unable to accept the representation. He recommended another Houston attorney, James Doyle ("Doyle") and ELS retained Doyle and his firm. Although not made explicit in the Consulting Agreement, it was contemplated that Beneke's consulting role would be played out under the aegis of the attorney representing ELS in pursuing its polybutylene claims, and there was little contact between Beneke and ELS after execution of the Consulting Agreement and Beneke's initial evaluation of the polybutylene plumbing problems at the 11 Hotels.

In its other polybutylene consulting relationships Beneke had worked closely with Moriarty, who had set up meetings with the polybutylene defendants to orchestrate joint examination of the buildings with polybutylene plumbing to determine the cost of replumbing and of remedying damage or loss caused by leaks. In this case, however,

Doyle failed to set up such meetings or to provide Beneke the opportunity to prepare the final report contemplated by the Consulting Agreement despite Beneke's frequent complaints to Doyle. These complaints resulted in another owner of hotels, which had also hired both Doyle and Beneke, to fire Doyle and retain other counsel.

ELS continued to retain Doyle, who ultimately hired another consultant. However, neither Doyle nor ELS terminated the Consulting Agreement or advised Beneke that it should stop work under the Consulting Agreement. Doyle testified that the new consultant was hired not to supplement Beneke but because Doyle concluded that the new consultant might make a better expert trial witness since, unlike Beneke, the new consultant had little or no prior involvement with polybutylene claims.

In fact, however, ELS' claims were settled without trial. Pursuant to that settlement the defendants paid $2,700.00 per unit in respect of those seven of the 11 Hotels that had polybutylene plumbing problems. It does not appear that Beneke was involved in negotiating that settlement or that its work under the Consulting Agreement, other than its preparation of its initial report, contributed directly to that settlement. Doyle testified, however, that Beneke played a valuable role in the polybutylene litigation of which ELS' claims were a part and in that sense contributed to the settlement.

ELS' objection to Beneke's administrative priority claim is grounded primarily in bankruptcy law. Its objection to Beneke's general unsecured claim is based upon contract and agency arguments grounded in state law. The latter objections will be considered first since it is doubtful that Beneke could show entitlement to an administrative priority claim unless it had a valid contractual claim under the Consulting Agreement. The Consulting Agreement stipulates that it is to be governed by Texas law and the parties have cited mainly Texas authorities in support of their contractual and agency arguments. There does not appear, however, to be any conflict between Texas law or the law of other jurisdictions.

## Beneke's Failure to Complete Performance of the Consulting Agreement

Soon after the Consulting Agreement was signed, Beneke examined all 11 Hotels and determined that seven had polybutylene plumbing systems. It prepared a Preliminary Polybutylene Product Survey soon after the Consulting Agreement was signed and had some discussions with the Plumbing Claims Group, which offered to replumb the Hotels with defective polybutylene systems. On Beneke's advice ELS rejected that offer. Instead ELS decided to press its claim through Doyle and instructed Beneke to work through Doyle.

The Consulting Agreement imposed upon Beneke certain specific obligations. In paragraph 2 Beneke undertook to estimate the loss and damage caused by leaks in the polybutylene plumbing systems to determine the most feasible method to replace the faulty systems with copper pipes and brass fittings and to estimate the loss, damage and cost of such replacement. In paragraph 3 ELS agreed to present claims for loss and damage against the manufacturers, designers, marketers and installers of the polybutylene plumbing systems. In paragraph 4 Beneke agreed to assist ELS in making that presentation and agreed to meet with ELS and its attorneys to review and explain its work product, which was defined in the Consulting Agreement as the "ESTIMATES". Under paragraph 6 of the Consulting Agreement Beneke's compensation from payments by the polybutylene defendants was to be made "upon presentation of the ESTIMATES as contemplated above."

It is clear from the evidence that the presentation of these ESTIMATES required cooperation from Doyle which was never forthcoming despite Beneke's repeated entreaties. Since ELS had effectively delegated its responsibilities under the Consulting Agreement to Doyle, ELS is bound by Doyle's failure to communicate with Beneke. Doyle effectively frustrated and ultimately prevented Beneke from preparing the ESTIMATES and completing its work under the Consulting Agreement and effected a settlement of ELS' claim through the use of anoth-

er consultant. The evidence indicates that Beneke was ready, willing and able to perform and complete its duties under the Consulting Agreement. Where, as here, one party to a contract wrongfully prevents the other party's performance, that action constitutes a breach of contract entitling the party wronged to recover damages for that breach. *See Kiewit Texas Mining Co. v. Inglish,* 865 S.W.2d 240, 245 (Tex.App.1993, writ denied); 14 TEX. JUR. 3D *Contracts* § 329 (1997); 17A AM. JUR. 2D *Contracts* § 717 (1997); 18 O. JUR. 3D *Contracts* §§ 247, 250 (1996). Therefore, the only question is the extent of Beneke's damages.

Both parties have assumed that such damages would be measured under paragraph 6 of the Consulting Agreement by the time properly expended by Beneke's representatives in work on behalf of ELS. The first issue is whether Beneke's damages should be limited by the fact that ELS owned only three of the seven Hotels with polybutylene plumbing systems.

**ELS' Responsibility As Owner/Agent**

■ Under paragraph 6 of the Consulting Agreement Beneke's compensation was fixed at "$150.00 per hour for time expended by BENEKE representatives in the performance of the services provided herein, but such compensation shall in no event be greater than ten percent (10%) of the total amount recovered by OWNER/AGENT ...." Beneke's total claims under the Consulting Agreement equal $142,200.00. The cash settlement paid by the polybutylene defendants in respect of the seven Hotels with polybutylene plumbing systems covered by the Consulting Agreement was in excess of $1,422,-000. Therefore, if the 10 percent cap applies to all seven Hotels, it would not limit Beneke's recovery. However, ELS received only $388,045.40 in respect of the three of the seven Hotels it owned. Therefore, if the 10 percent cap is limited to these three Hotels, Beneke's claims would be limited to $38,-804.54. As noted previously, the other eight Hotels covered by the Consulting Agreement were owned or leased by ERS, a company owned and controlled by the shareholders, directors and officers of ELS.

There is no evidence that Beneke knew of ERS' interest in eight of the 11 Hotels. In his letter of August 13, 1993, to Robert Beneke, then Beneke's president and owner, Leonetti stated that ELS' desire was to make "claims for the installation of the faulty polybutylene plumbing system[s] for a limited number of motels which are owned by this company." At the trial Robert Beneke's testimony that he believed that ELS owned all 11 Hotels was not impeached. Nevertheless, ELS argues that the Consulting Agreement's use of the term "Owner/Agent" to identify ELS meant that Beneke knew or should have known that ELS might be acting as agent instead of owner for some of the 11 Hotels. ELS bases its argument on the fact that although Beneke chose the term "Owner/Agent" to describe ELS in the Consulting Agreement, Beneke had entered into other similar polybutylene consulting arrangements under contracts identifying the other contracting party simply as "Owner".

■ Even if this argument were accepted, it would not relieve ELS from its responsibilities under the Consulting Agreement in respect of the 11 Hotels. The general rule is that an agent who signs a contract without disclosing both the fact of the agency and the identity of the principal for whom the agent is acting is personally liable under the contract. *See Lacquement v. Handy,* 876 S.W.2d 932, 939 (Tex.App.1994, no writ); 3 TEX. JUR. 3D *Agency* § 187 (1997); 3 AM. JUR. 2D *Agency* § 325 (1997); 3 O. JUR. 3D *Agency* § 171 (1996). Therefore, even if designation of ELS as Owner/Agent were deemed to have put Beneke on notice that ELS might be acting as an agent, ELS' admitted failure to identify ERS as the undisclosed principal for which it was acting means that ELS cannot avoid liability under well-settled agency principals.

ELS cites as support for its contention to the contrary one Texas Court of Appeals case, *J. Parra e Hijos v. Barroso,* 960 S.W.2d 161 (Tex.App.1997, no writ). In *Barroso,* the Texas court found that there was actual disclosure of both the fact of agency and the identity of the principal. However, the court went on to observe that the defendant would not be liable under the contract because nu-

merous facts had put the plaintiff on notice that the defendant was acting solely as agent. *Barroso,* 960 S.W.2d at 168. Here the only circumstance suggesting notice to Beneke that ELS might not own all 11 Hotels was use of the term "Owner/Agent" in the Consulting Agreement to describe ELS. Robert Beneke testified credibly, however, that the term "Owner/Agent" was chosen not because of any doubt as to the ownership of the 11 Hotels but because of the possibility that other hotels in the Knights Inn system might later be added to the Consulting Agreement, a possibility Leonetti noted in his August 13, 1993, letter.

## Beneke's Time Charges

■ ELS objects to the appropriateness and accuracy of the time charges of Beneke's representatives that comprise Beneke's claim under paragraph 6 of the Consulting Agreement. That paragraph provides in relevant part that "[t]he amount of the compensation to BENEKE shall be $150.00 per hour for time expended by BENEKE representatives in the performance of the services provided herein. . . ." Beneke kept its time in hourly increments. ELS argues that failure to record time in smaller increments was inherently unreasonable and resulted, through rounding up, in overcharging ELS. The Consulting Agreement provides no guidance as to how Beneke was to keep track of its representatives' time. This left the task of implementing an appropriate time recording mechanism to Beneke. Beneke developed and implemented a procedure whereby its employees kept track of the time they devoted to the Consulting Agreement in an organized and substantially contemporaneous manner. Despite ELS' complaints, there is no evidence that the method adopted by Beneke resulted in material overcharges to ELS or was otherwise materially inaccurate.

Similarly, ELS complained that the time charged to conferences and meetings was excessive and unreasonable. Robert Beneke's unimpeached testimony, however, was that the meeting time was necessary and appropriate to Beneke's duties under the Consulting Agreement and that that time reflected its usual consulting activities. ELS presented no testimony that contradicted Mr. Beneke's testimony.

■ ELS also complained that Beneke's time devoted to dealing with requests from Doyle for examination of Knights Inn hotels which were not included among the 11 Hotels should not be charged to ELS. These requests appeared to have been prompted by the fact that Doyle thought that Beneke's role under the Consulting Agreement encompassed Knights Inn hotels in addition to the 11 Hotels. Since, however, Doyle was prosecuting the polybutylene claims on ELS' behalf and Beneke's performance under the Consulting Agreement was subject to Doyle's control, Beneke's responses to Doyle's inquiries appear appropriately included as compensable services under paragraph 6.

## Beneke's Representatives

■ ELS' objection to Beneke's inclusion of clerical time as compensable under paragraph 6 raises a more difficult issue. $19,237.50 of the $142,200.00 claim represented the time of three Beneke secretaries, Gloria Jeffcoat, Sharon Leal and Sylvia Fitzpatrick. Another $18,150.00 represents the time of Niki Gonzales, who was identified as an executive assistant. Although Mr. Beneke testified that Ms. Gonzales had some minimal adjusting experience, her time too appears mainly secretarial. The balance of the time billed was for individuals who were consultants or adjusters.

Beneke takes the position that paragraph 6 of the Consulting Agreement was intended to encompass the time of any Beneke employee, including secretaries, who charged time to ELS under the Consulting Agreement. However, the Consulting Agreement bases compensation on $150.00 per hour for time expended by Beneke "representatives", not Beneke "employees". Normally the term "representative" would designate a person with some agency responsibilities, *i.e.,* a person having the duty and authority to represent another person or organization in some business or transaction. Black's Law Dictionary defines a "representative" as including "an agent, an officer of a corporation or association, and a trustee, executor or administrator of an estate, or any other person

empowered to act for another." BLACK'S LAW DICTIONARY 1302 (6th ed.1990); *see also* WEBSTER'S NEW WORLD DICTIONARY 1206 (2d. college ed.1986). Given its natural signification the word "representative" would not describe employees performing clerical work.

There is nothing in the evidence that indicates that the parties understood or agreed that the word "representative" was used as a term of art or should be accorded the unusually broad meaning that Beneke would impart to it. Here, as elsewhere, it appears that the parties paid relatively little attention to the mechanics of computing time for purposes of paragraph 6 of the Consulting Agreement. ELS focused, instead, on assuring itself that it would have no liability for Beneke's services beyond 10 percent of its recovery on its polybutylene claims. But Beneke chose the word "representative" to identify those employees whose services would be charged at the rate of $150.00 an hour. In the absence of some agreement giving the term a special meaning, which is not present, Beneke is bound by the ordinary meaning of the term.

### Beneke's Post–Filing Time

It appears that Beneke was put on notice that ELS might have filed for bankruptcy in a June 1995 conversation between Doyle and Robert Beneke. Beneke had knowledge of ELS' bankruptcy filing by late August or early September 1995. Nevertheless it continued to charge time under the Consulting Agreement during the next several months. ELS addressed this time primarily from the perspective of its qualification for administrative expense priority rather than as a component of Beneke's damages under the Consulting Agreement. Whether or not Beneke knew, or should have known, of ELS' filing, this time appears properly includable in its damage claim under the Consulting Agreement.

■ A bankruptcy filing is not of itself an anticipatory repudiation by the debtor of an executory contract. *See Beeche Sys. Corp. v. D.A. Elia Constr. Corp. (In re*

*Beeche Sys. Corp.)*, 164 B.R. 12, 16 (N.D.N.Y. 1994). ELS might in principle have assumed the Consulting Agreement and required continuing performance by Beneke.[1] So far as appears Beneke's continued work under the Consulting Agreement was done with the belief that the Agreement was still in force and that such work was appropriate. No evidence was presented that indicated that by stopping performance in either June or August of 1995 Beneke could have reduced its damages by devoting its time and efforts elsewhere. In general, the defendant has the burden of showing that the plaintiff failed to mitigate damages and ELS did not carry that burden in this case. *See* 28 TEX. JUR. 3D *Damages* § 194 (1997); 22 AM. JUR. 2D *Damages* § 896 (1997); 30 O. JUR. 3D *Damages* § 116 (1996).

### Summary of Contract Claim

Based on the foregoing the Court finds that Beneke has a valid unsecured claim under the Consulting Agreement in the amount of $104,812.50, its total claim less secretarial time. However, for the reasons set forth below none of such claim is entitled to administrative priority under section 507(a)(1) which accords a first priority to administrative expenses allowed under section 503(b) of the Bankruptcy Code.

### Administrative Expense Priority

■ Section 503(b)(1)(A) provides in relevant part that "there shall be allowed administrative expenses ... including—the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case...." 11 U.S.C. § 503(b)(1)(A) (1994). Numerous cases in this and other circuits have attempted to prescribe standards to determine what claims are entitled to the benefit of this priority, which generally assures payment in full of the claim as opposed to little or perhaps no payment as a general unsecured claim. The general rule is that to qualify as an administrative expense a contractual claim

---

**1.** *See* 11 U.S.C. § 365(a) (1994) (allowing trustee to assume or reject any executory contract of debtor); *see also Beeche Sys. Corp.,* 164 B.R. at 16 ( "If the mere filing of bankruptcy constituted

an anticipatory breach of contract, [the] decision by the trustee to assume or reject a contract could never be reached, thereby rendering meaningless [section 365] of the Bankruptcy Code").

must (a) arise from a transaction entered into postpetition between the claimant and the debtor-in-possession or trustee, and (b) directly and substantially benefit the estate. *See Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir.1997); *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106, 110 (6th Cir.1987); *In re Jartran, Inc.*, 732 F.2d 584, 586–87 (7th Cir.1984); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir.1976). Obviously, Beneke's claim flunks this test since the Consulting Agreement was entered into prepetition and ELS, as debtor-in-possession, never entered into any agreement covering Beneke's postpetition performance. Beneke attempts to avoid this difficulty by arguing that ELS' failure to list Beneke as a creditor or to take some other positive action to terminate Beneke's postpetition work affords that work administrative priority under cases which have carved out exceptions to the requirements of a postpetition contract.

Beneke cites *United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.)*, 851 F.2d 159 (6th Cir.1988) and *Goldin v. Putnam Lovell, Inc. (In re Monarch Capital Corp.)*, 163 B.R. 899 (Bankr. D.Mass.1994), as authority for the proposition that a claim based on a prepetition contract may be granted administrative priority where failure to do so would unjustly enrich the debtor or its creditors. In *United Trucking*, the debtor had leased truck trailers from the claimant under a prepetition equipment lease that required the debtor to maintain the trailers in good condition and repair. Following the debtor's filing, the claimant filed a petition to compel the debtor to either assume or reject the lease. However, the debtor continued to use the trailers without assuming the lease and without expending the moneys necessary to maintain

and repair them. The lease was ultimately deemed rejected and the debtor returned the trailers substantially reduced in value. *United Trucking*, 851 F.2d at 160–61. The court awarded the claimant an administrative expense claim measured by the postpetition expense that the debtor had saved by failing to maintain and repair the trailers. *Id.* at 164.

In *Monarch Capital*, a broker employed by the debtor prepetition found a purchaser for its assets postpetition. The broker claimed the commission provided by the prepetition contract as an administrative expense. *Monarch Capital*, 163 B.R. at 903. Although the court denied that claim because the contract was not assumed by the debtor-in-possession, it held that the broker was entitled to an administrative claim measured by the benefit conferred upon the estate because the debtor-in-possession had urged the broker to continue its efforts to find a buyer. *Id.* at 908. *Monarch Capital*, therefore, provides little help for Beneke's position since Beneke measures its administrative claim by the services it performed under the Consulting Agreement, not by a benefit realized by ELS' bankruptcy estate.

█ The facts in the present case are quite different from those in either *United Trucking* or *Monarch Capital*. First, ELS as debtor-in-possession did not urge or induce Beneke to continue its services. So far as appears, ELS was not even aware of Beneke's postpetition work. Beneke attempts to surmount this obstacle by contending that ELS, as debtor-in-possession, had a duty to list Beneke as a claimant or otherwise notify it of ELS' bankruptcy proceeding. It appears, however, that any failure in this regard was at worst inadvertent—ELS' chaotic circumstances at all relevant times amply explain this omission.[2] More important-

---

**2.** Shortly before ELS' bankruptcy filing, the FDIC, acting as receiver for a bank that had loaned money to ELS, initiated a collection action against ELS in the United States District Court for the Western District of Missouri. The Missouri District Court entered a freeze order and allowed the receiver to take immediate possession and control of all ELS' properties and records. On October 4, 1994, about two weeks after the entry of the freeze order, ELS filed a

Chapter 11 bankruptcy petition in this Court together with a complaint and motion for an order requiring the FDIC to turn over property of ELS' bankruptcy estate. At an emergency hearing the next day, this Court entered a temporary order granting ELS' motion.

On October 7, 1994, the District Court for the Northern District of Ohio entered two orders: (i) withdrawing the reference of the bankruptcy pro-

ly, there is nothing in the cases or in the rationale for granting administrative expense priority which would justify allowing one creditor to improve its position at the expense of other creditors because of such a breach of duty by a debtor-in-possession.

Second, to find unjust enrichment one needs first to find enrichment. There is in this case no evidence that Beneke's postpetition work conferred any benefit whatsoever on ELS or its estate. So far as appears from the evidence, the benefit conferred by Beneke on ELS under the Consulting Agreement was acquainting it with the polybutylene problem, initiating ELS to the polybutylene claims process and providing ELS and its counsel an initial report of Beneke's examination of the 11 Hotels. All of this was accomplished prepetition. So far as appears none of Beneke's postpetition work under the Consulting Agreement was used by Doyle or ELS or in any way contributed to the ultimate settlement of ELS' claims. The fact that Beneke's performance under the Consulting Agreement may have been a detriment to it does not transmute that detriment into a benefit to ELS, and it is only a benefit in the form of unjust enrichment which may be rewarded as an administrative expense under *United Trucking* and *Monarch Capital.*

*Monarch Capital* does justify its award of an administrative expense in part on the theory that a party to a prepetition executory contract with a debtor has a duty to continue performance until the contract is rejected. *Monarch Capital,* 163 B.R. at 907. This theory, as an independent ground for conferring administrative expense priority, appears not only to conflict with the general rule requiring both a postpetition agreement and postpetition benefit, but would largely vitiate the Code's requirement of court approval for the debtor's assumption of executory contracts under section 365(a) and for the debtor's

entry into transactions outside the ordinary course of its business under section 363(b)(1). *Cf. Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25 (2nd Cir. 1996) (bankruptcy court required to determine that postpetition contract is in best interest of estate to justify administrative expense priority).

Beneke appeals to *Irmas Family Trust v. Madden (In re Madden),* 185 B.R. 815 (9th Cir. BAP 1995), to support its argument that its postpetition work under the Consulting Agreement qualifies for administrative expense priority, even though it did not benefit ELS' estate. In *Madden,* the BAP accorded administrative priority to an attorneys fee award made by a state court against the debtor-in-possession under a prepetition contract because the debtor-in-possession had elected to continue litigation under the contract. *Madden,* 185 B.R. at 819. In reaching this conclusion the BAP relied upon *Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). *Id.* at 818. In *Reading,* a negligently caused fire broke out on the debtor's property and spread to the plaintiff's adjoining building. *Reading,* 391 U.S. at 473–74, 88 S.Ct. 1759. The Supreme Court held that the liabilities arising from the fire arose in the ordinary course of the administration of the estate and should, in fairness, be paid ahead of prepetition claims. *Id.* at 485, 88 S.Ct. 1759.

Even if *Madden* were good law, it would not help Beneke, however, since there is no evidence that ELS as debtor-in-possession elected to continue with the Consulting Agreement. But *Madden* has been effectively overruled by the Ninth Circuit Court of Appeals. *See Abercrombie v. Hayden Corp. (In re Abercrombie),* 139 F.3d 755, 759 (9th Cir.1998). In *Abercrombie,* the Ninth Circuit concluded that *Reading* was limited to tort claims and that the BAP's reliance on *Reading* in the case of a prepetition contract claim

---

ceeding from this Court and (ii) transferring the adversary proceeding with the FDIC to the Missouri District Court. Accordingly, the receiver was reinstated and reasserted control over ELS' properties and records. Finally, on January 19, 1995, after venue was transferred back to Ohio and appeals to the Sixth Circuit were voluntarily dismissed, the District Court remanded the ad-

versary proceeding to this Court and, by an order entered January 27, 1995, this Court reinstated its previous order compelling the receiver to turn over the property of ELS' bankruptcy estate. Not until February 7, 1995, and under the supervision of an examiner, did ELS regain physical possession of its properties and records.

was misplaced. *Id.* at 758–59; *see also Wo-burn Assocs. v. Kahn (In re Hemingway Transport Inc.),* 954 F.2d 1, 6–7 (1st Cir. 1992) (limiting application of *Reading* exception). This Court agrees that *Reading* is inapplicable to Beneke's claim.