In re ECONOMY LODGING
SYSTEMS, INC.,
Debtor.

The Beneke Company, Inc., Appellant.

v.

Economy Lodging Systems,
Inc., Appellee.

BAP No. 98–8089.

United States Bankruptcy Appellate Panel
of the Sixth Circuit.

Submitted March 30, 1999.

Decided June 16, 1999.

Jonathan M. Yarger, Ellen Maglicic Kramer, Kohrman, Jackson & Krantz, Cleveland, Ohio, were on brief, for Appellant.

Jeffrey C. Toole, Harry W. Greenfield, Buckley, King & Bluso, Cleveland, Ohio, were on brief, for Appellee.

Before: BROWN, STOSBERG, and WALDRON, Bankruptcy Appellate Panel Judges.

## OPINION

The Beneke Company, Inc. appeals from an order of the bankruptcy court disallowing Beneke's unsecured claim for fees billed to the Debtor for services rendered by Beneke's secretaries and execu-

tive assistant and holding that Beneke's postpetition fees arising from prepetition contractual obligations are not administrative priority expenses pursuant to 11 U.S.C. § 503(b)(1)(A). We **AFFIRM**.

## I. ISSUES ON APPEAL

Two issues are before the Panel on appeal: (1) whether the bankruptcy court erred in concluding that the term "representatives" as used in the parties' fee agreement does not include Beneke's secretaries and executive assistant, and (2) whether the bankruptcy court abused its discretion in denying Beneke's request for § 503(b)(1)(A) administrative expense priority for postpetition fees incurred pursuant to Beneke's prepetition agreement with the Debtor.

## II. JURISDICTION AND STANDARD OF REVIEW

■ The Bankruptcy Appellate Panel has jurisdiction over final orders of the bankruptcy court for the Northern District of Ohio pursuant to 28 U.S.C. § 158(a)(1) and (c). The bankruptcy court's order of October 28, 1998, disallowing that portion of Beneke's unsecured claim representing fees incurred for secretarial services and for services of its executive assistant and denying administrative expense priority under § 503(b)(1)(A) for Beneke's postpetition fees, is a final, appealable order. *Tedeschi v. Falvo (In re Falvo)*, 227 B.R. 662, 663 (6th Cir. BAP 1998) (a bankruptcy court's order is final when it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment") (quoting *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S.Ct. 1494, 1497, 103 L.Ed.2d 879 (1989) (citations omitted)).

■ The bankruptcy court's conclusions as to the proper interpretation of a contract are subject to de novo review. *First Bank of Ohio v. Brunswick Apartments of Trumbull County, Ltd. (In re Brunswick Apartments of Trumbull County, Ltd.)*, 215 B.R. 520, 522 (6th Cir.

BAP 1998) (citations omitted), *aff'd*, 169 F.3d 333 (6th Cir.1999). The Panel determines an issue of law independently of the bankruptcy court's determination. *Palmer v. IRS (In re Palmer)*, 228 B.R. 880, 881–882 (6th Cir. BAP 1999) (citations omitted).

■ The bankruptcy court's denial of Beneke's claim for administrative expense priority pursuant to § 503(b)(1)(A) is reviewed for an abuse of discretion. *Citybank v. Udhus (In re Udhus)*, 218 B.R. 513, 515 (9th Cir. BAP 1998). "An abuse of discretion occurs only when the [bankruptcy] court 'relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard.'" *Sicherman v. Diamoncut, Inc. (In re Sol Bergman Estate Jewelers, Inc.)*, 225 B.R. 896, 899 (6th Cir. BAP 1998) (quoting *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 480–481 (6th Cir.1996) (citations omitted) (alteration in original)).

■ To the extent that this appeal involves the bankruptcy court's interpretation of the applicable statute, we review the question of law de novo. *See Andersson v. Security Fed. Sav. & Loan of Cleveland (In re Andersson)*, 209 B.R. 76, 77 (6th Cir. BAP 1997) (citing *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595 (6th Cir.1997)).

## III. FACTS

The Debtor, Economy Lodging Systems, Inc. ("ELS"), which owns and manages motels, was alerted to the possible existence of defective polybutylene plumbing systems in some of its motel buildings. The Beneke Company ("Beneke") is a property loss consultant and is known in the motel industry as an expert on polybutylene plumbing systems and their defects. On September 8, 1993, ELS and Beneke entered into an "Estimating and Consulting Agreement" ("Agreement") whereby Beneke agreed to, among other things, "locate, estimate and document the loss

and damage incurred by reason of faulty polybutylene plumbing systems" and assist ELS in the pursuit of any claims arising from defective polybutylene plumbing installed in any of the eleven motels specified in the parties' Agreement. The Agreement further provided, in pertinent part:

2. Services. The services to be performed by BENEKE include the estimating of loss and damage to the SYSTEMS and to surrounding areas and property caused by leaks in the SYSTEMS, the identification of the polybutylene, and shall include the determination of the most feasible methods to replace the SYSTEMS with copper pipes and brass fittings, together with the estimating of the loss, damage · and costs associated with such replacement.

. . . .

6. Compensation. BENEKE's compensation for services hereunder, shall be paid from any payment, whether by settlement, judgment or otherwise, by any manufacturers, designers, marketers and/or installers of such polybutylene plumbing systems upon presentation of the ESTIMATES as contemplated above. The amount of the compensation to BENEKE shall be $150.00 per hour for time expended by BENEKE *representatives* in the performance of the services provided herein, but such compensation shall in no event be greater than ten percent (10%) of the total amount recovered by OWNER/AGENT for OWNER/AGENT's loss and damage, whether recovered by settlement, judgment or otherwise. Payment of compensation to BENEKE shall be due only upon receipt by OWNER/AGENT of any settlement or judgment proceeds paid of OWNER/AGENT's claim. (emphasis added).

. . . .

8. Except to the extent BENEKE may present the ESTIMATES to *representatives* of the manufacturers, designers, marketers and installers, BENEKE will not assert or present any claim or engage in any settlement or negotiations, mediations, arbitration or litigation other than by providing information to OWNER/AGENT or its lawyers in support of such proceedings, or by acting as an expert witness. (emphasis added).

. . . .

14. Writing Required. A waiver, alteration, or modification of any of the provisions of this agreement shall not be binding unless in writing and signed by authorized *representatives* of the parties to this AGREEMENT. (emphasis added).

. . . .

Beneke assisted ELS in obtaining experienced legal counsel and then maintained contact with and reported to that attorney rather than directly to ELS. During the course of its investigation, Beneke prepared a preliminary survey, which indicated that seven of the eleven motels Beneke inspected had been damaged or would incur damages as a result of defective polybutylene plumbing systems. ELS decided to pursue its claims by joining in a lawsuit with other plaintiffs.

Communications between Beneke and ELS's attorney subsequently deteriorated, and the attorney hired a different consulting firm to complete the plumbing project and to assist in the pursuit of ELS's damage claims. However, neither the attorney nor ELS officially terminated the Beneke Agreement nor advised Beneke to stop work on the project. The new consulting firm repeated Beneke's work and provided other services, and ELS's lawsuit eventually settled out of court.

ELS was placed in a receivership and subsequently commenced its Chapter 11 bankruptcy on October 4, 1994. ELS regained access to its corporate offices and

records for two days following the Chapter 11 filing and then lost control of its corporate documents again until the receivership was lifted on February 7, 1995. ELS's corporate records were apparently in significant disarray during this period, and ELS completed its bankruptcy schedules primarily from its accounts receivable records. These records did not identify Beneke as a creditor because, pursuant to the contingent payment terms of the parties' Agreement, no payment was due Beneke at that time. As a result, ELS failed to list Beneke as a creditor on its bankruptcy petition. Beneke therefore had no notice of ELS's bankruptcy until the Summer of 1995 but continued its work on the ELS project well after that time.

Approximately one year after learning of the bankruptcy, Beneke filed a motion for leave to file its proof of claim and a motion for administrative expense priority for its postpetition fees. In addition to the fees billed for prepetition work by Beneke consultants, Beneke's total claims of $142,-200 also represented secretarial and executive assistant fees of $37,387.50, and $50,-212.50 in fees incurred postpetition.

ELS objected to the amount billed for the services of Beneke's secretaries and executive assistant, arguing that these employees were not "representatives" contemplated in paragraph six of the parties' Agreement. ELS also objected to Beneke's motion for administrative expense priority for its postpetition fees because Beneke failed to meet the requirements of § 503(b)(1)(A) of the Bankruptcy Code. The bankruptcy court allowed Beneke an unsecured claim of $104,812.50, after disallowing the secretarial and executive assistant fees.

Relying on well-established rules of contract construction, the bankruptcy court determined that the term "representatives" in the Agreement did not encompass Beneke's secretaries and executive assistant. The bankruptcy court also determined that Beneke's claim for postpetition fees was not entitled to administrative ex-

pense priority pursuant to § 503(b)(1)(A), as Beneke's Agreement with the Debtor arose prepetition and Beneke failed to show that the bankruptcy estate benefitted from its postpetition services.

On appeal, Beneke argues that the parties intended the term "representative" to include Beneke's clerical employees and staff for billing purposes, or that the term is so ambiguous as to permit such a broad definition. Beneke further argues that its claim for postpetition services is entitled to administrative expense priority due to the Debtor's breach of duty in failing to list Beneke as a creditor in the bankruptcy petition and because the Debtor will otherwise be unjustly enriched.

## IV. DISCUSSION

### A. Interpretation of the term "representative" in the Agreement

■ The Agreement stipulated that it is to be governed in accordance with Texas law. In construing a contract under Texas law, courts must "give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). Mere disagreement over the meaning of a provision in the contract does not make it ambiguous. In the absence of ambiguity, the court is to limit its search for the parties' intent to the four corners of the contract. *Corrections Corp. of America v. Microcomputer Tech. Inst.*, No. 09–93–306CV, 1996 WL 38921, at *2 (Tex.App. Feb. 1, 1996) (citing *County of Maverick v. Texas Ass'n of Counties Workers' Compensation Self-Insurance Fund*, 852 S.W.2d 700, 705 (Tex.App.1993) and *Rutherford v. Randal*, 593 S.W.2d 949, 953 (Tex.1980)). *See also Melvin Green, Inc. v. Questor Drilling Corp.*, 946 S.W.2d 907, 910 (Tex.App.1997).

■ The bankruptcy court, looking at the four corners of the Agreement, deter-

mined that the ordinary meaning of the term "representative" was the meaning supplied by BLACK'S LAW DICTIONARY 1302 (6TH ed.1990), which defines "'representative' as including 'an agent, an officer of a corporation or association, and a trustee, executor or administrator of an estate, or any other person empowered to act for another.'" *In re Economy Lodging Sys., Inc.,* 226 B.R. 840, 845–846 (Bankr. N.D.Ohio 1998). Noting that Beneke chose to use the term "representatives" and not "employees," the bankruptcy court pointed out that "[n]ormally the term 'representative' would designate a person with some agency responsibilities, i.e., a person having the duty and authority to represent another person or organization in some business or transaction." *Id.* at 845. Not finding any ambiguity in the contract, the bankruptcy court also found "nothing in the evidence that indicates the parties understood or agreed that the word 'representative' was used as a term of art or should be accorded the unusually broad meaning that Beneke would impart to it." *Id.* at 846. We agree with the bankruptcy court.

Beneke's argument that "[it] is quite reasonable ... for the term 'representative' to include clerical employees" is inconsistent with the ordinary meaning of the term and with the manner in which the term is used elsewhere in the Agreement. *See Clardy Mfg. Co. v. Marine Midland Business Loans Inc.,* 88 F.3d 347, 352 (5th Cir.1996) (the court "should examine and consider the *entire* writing in an effort to harmonize and give effect to *all* the provisions of the contract so that none will be rendered meaningless") (quoting *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983) (emphasis in original)). For example, the Agreement states that "[t]he amount of the compensation to BENEKE shall be $150.00 per hour for time expended by BENEKE representatives in the performance of the services provided herein." As set forth in the Agreement, however, the "services provided herein" include estimating loss and damage, iden-

tifying polybutylene, and determining the most feasible methods of replacement of the plumbing systems, tasks generally not assigned to secretarial or executive staff but more appropriately performed by Beneke's trained consultants or adjusters. The bankruptcy court found the executive assistant's time to be "mainly secretarial." *Economy Lodging Sys.,* 226 B.R. at 845. Moreover, the testimony established that the secretaries had no "special expertise" and that the executive assistant had performed only "minimal adjusting work." Presumably, Beneke's secretaries and executive assistant would have been paid their same respective salaries by Beneke whether they did or did not work on the ELS project. *See First Bank v. Brunswick Apartments of Trumbull County, Ltd. (In re Brunswick Apartments of Trumbull County, Ltd.),* 169 F.3d 333 (6th Cir.1999) (rejecting a creditor's attempt under Code § 506(d) to bill the debtor for services of salaried employees who were paid the same by the creditor regardless of how their time was spent).

In addition, the term "representatives" also appears in the Agreement in a context that does not ordinarily include secretaries or executive assistants. It is unlikely, under the terms of the Agreement, that Beneke intended to present its damage estimates to the secretaries of its clients. Likewise, it is also improbable that a secretary or an executive assistant would be authorized to waive, alter or modify the Agreement on Beneke's behalf. In the context of the Agreement, the uses of the term "representatives" are consistent with the bankruptcy court's view that the term refers to one "empowered to act for another." *Economy Lodging Sys.,* 226 B.R. at 845–846.

For these reasons, we conclude that the bankruptcy court properly applied the ordinary meaning to the term "representatives" and properly found that the term does not encompass Beneke's secretarial and executive assistant staff.

## B. Administrative expense priority

Section 503(b)(1)(A) of the Bankruptcy Code states:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
>
> > (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]

11 U.S.C. § 503(b)(1)(A).

The purpose of this Code section is to encourage third parties to provide the debtor in possession with goods and services essential to rehabilitation of the business. *United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.)*, 851 F.2d 159, 161 (6th Cir.1988) (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976)). The Sixth Circuit normally utilizes what has become known as the "benefit to the estate test" in order to determine what qualifies as an "actual, necessary" administrative expense. Under this test, a claimant must prove that the debt "(1) arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." *Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir.1997). *See also United States v. Schottenstein, Zox & Dunn (In re Unitcast, Inc.)*, 219 B.R. 741, 746 (6th Cir. BAP 1998). The bankruptcy court correctly found that Beneke's claim failed this test.

Exceptions to the "benefit to the estate" test have been recognized, and Beneke partially relies upon these exceptions, including an exception to the strict postpetition element of the test. In *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), the Supreme Court, interpreting the former Bankruptcy Act,

held that a creditor's postpetition negligence claims against a bankruptcy receiver were proper administrative expenses of the estate, even though the estate received no substantial benefit.

The Sixth Circuit has also carved out an "unjust enrichment" exception to the general rule, where the court found that priority expenses under § 503 "should reflect actual value conferred on the bankrupt estate by reason of wrongful" conduct on the part of the debtor. *United Trucking Serv.*, 851 F.2d at 162 (citation omitted).

The thrust of Beneke's argument in support of its claim for administrative expense priority is that ELS breached a duty to Beneke when ELS failed to schedule or otherwise provide notice to Beneke of its pending bankruptcy, and, as a result, Beneke continued working under the Agreement without seeking assumption of the contract. Beneke also contends that the bankruptcy estate has benefitted by Beneke's postpetition services and by the Debtor's failure to pay Beneke's fees.

The bankruptcy court explained that Beneke's postpetition work could not satisfy the test for administrative expense priority set forth by the Sixth Circuit in *Sunarhauserman*, 126 F.3d at 816, because the agreement giving rise to Beneke's claim arose prepetition. *Economy Lodging Sys.*, 226 B.R. at 847. We agree. "[I]t is an absolute requirement for administrative expense priority that the liability at issue arise post-petition." *Sunarhauserman*, 126 F.3d at 817. The Sixth Circuit has made it clear that *Reading's* exception is a limited one: "*Reading* does not eliminate the requirement that a debt arise post-petition in order to be accorded administrative expense priority." *Id.*

The bankruptcy court also determined that Beneke's claim was not entitled to administrative expense priority under the rule set forth in *Irmas Family Trust v. Madden (In re Madden)*, 185 B.R. 815 (9th Cir. BAP 1995), which relied on the Supreme Court's decision in *Reading* to hold that a postpetition attorney fees award

arising from a prepetition contract may qualify as an administrative expense even when such costs do not benefit the estate. *Madden,* 185 B.R. at 819. As the bankruptcy court correctly noted, courts have actively limited *Reading* to tort cases or cases of intentional misconduct on the part of the trustee or debtor in possession. *Economy Lodging Sys.,* 226 B.R. at 848–49. *See Abercrombie v. Hayden Corp. (In re Abercrombie),* 139 F.3d 755, 758–59 (9th Cir.1998) (collecting cases and effectively overruling *Madden*); *In re Lazar,* 207 B.R. 668, 683–84 (Bankr.C.D.Cal.1997) (following Ninth Circuit precedent that "has construed narrowly the administrative expense priority under the *Reading* rule, and has limited it to 'post-petition tort-like conduct,'" and further holding "where there is not active postpetition wrongdoing by the debtor or trustee, *Reading* does not apply"). Further, as the First Circuit pointed out in *Woburn Associates v. Kahn (In re Hemingway Transport, Inc.),* 954 F.2d 1, 7 (1st Cir.1992), *aff'd in part and vacated in part,* 993 F.2d 915 (1st Cir.1993), "We are aware of no authority that the *Reading–Charlesbank* exception encompasses a right to payment originating in a prepetition contract with the debtor." *See Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.),* 755 F.2d 200 (1st Cir.1985) (postpetition civil fine for debtor's disregard of tort-based injunction allowed administrative expense priority).

Beneke also relies on *United Trucking Service* and *Goldin v. Putnam Lovell, Inc. (In re Monarch Capital Corp.),* 163 B.R. 899 (Bankr.D.Mass.1994), in support of its argument that failure to grant administrative priority would unjustly benefit the debtor.[1] The parties in *United Trucking Service* entered into a prepetition lease agreement for the use of semitrailers, under which the debtor was obligated to maintain the trailers, thus eventually prompting the lessor to seek administra-tive priority for losses incurred as a result of the debtor's postpetition failure to meet its maintenance obligations. The court determined that the "benefit to the estate" test was inapplicable, as those cases applying the test dealt with claims arising from goods or services actively sought by the debtor and provided by the creditor to the bankruptcy estate. *United Trucking Serv.,* 851 F.2d at 162. Instead, the court applied essentially an "unjust enrichment" analysis and granted administrative priority to the lessor, stating:

> In light of the Act's purpose of enabling the continued operation of insolvent businesses, we conclude that the bankruptcy court was correct in treating TRC's post-petition damages claim as an administrative expense under § 503. United's asserted failure to maintain and repair the trailers in accord with the lease obligation allowed United, the debtor, to use the money saved and not paid for TRC's benefit as contemplated under the lease, to continue its operations. This breach and misuse of TRC's trailers did benefit the bankrupt estate. Accordingly, the damages under the breached lease covenant, to the extent that they occurred post-petition, provided benefits to the bankrupt estate and were properly accorded priority under § 503 to TRC.

*Id.* at 162.

Going further, the court placed a limit on its ruling: "[Section] 503 priority should be granted only to reflect actual value conferred on the bankrupt estate." *Id.* at 163. In the present case, the bankruptcy court found a lack of "any benefit" conferred upon the estate by Beneke's postpetition work. *Economy Lodging Sys.,* 226 B.R. at 848. The court's finding is not clearly erroneous; thus, Beneke failed in its burden of proving postpetition benefit or "actual value conferred on the bankrupt estate." *United Trucking Serv.,* 851 F.2d at 163. Beneke's argument that

---

**1.** The *Monarch* court relied on principles of restitution, determining that all a creditor need establish to recover the value of its services is that it "rendered postpetition services pursuant to its prepetition contract, without objection by the Trustee, and that the services had value to the estate." *Monarch,* 163 B.R. at 907.

it established value based upon the $150 hourly contract fee fails in light of this Circuit's adoption of an actual value standard rather than a "contract price" standard. *Id.* (quoting *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 124 (2nd Cir. 1960)).

Beneke also contends that the benefit conferred in *United Trucking Service* was the debtor's continued use of cash that should have been paid to the lessor and argues that ELS similarly benefitted in this case by retaining the use of funds that should have been paid to Beneke for its postpetition services. The *United Trucking Service* Court found unjust enrichment not merely in the fact that the estate failed to pay a creditor and instead used the money elsewhere, but also in the fact that the debtor in possession continued to take advantage of the creditor's property in the postpetition operation of the debtor's business. In contrast, the Debtor here appears to have been unaware that Beneke was even providing services postpetition, and the evidence fully supports the bankruptcy court's finding that the Debtor did not take advantage of Beneke's services in the postpetition operation of the Debtor's business such that the Debtor and the estate's other creditors would be unjustly enriched at Beneke's expense.

The proof also supports the bankruptcy judge's finding that the Debtor did not induce Beneke's postpetition work. Beneke's argument that it was so induced and, thus, harmed by the Debtor's failure to schedule this creditor, thereby creating a postpetition obligation between the Debtor and Beneke, is undermined by Beneke's one-year delay between obtaining knowledge of the bankruptcy and filing its motion for administrative expense priority. The Debtor's failure to schedule Beneke, which the bankruptcy court found to be justifiably explained, does not rise to the level of the egregious nature of the debtor's actions in *United Trucking Service. See, e.g., In re Cardinal Indus., Inc.*, 142 B.R. 801, 805 (Bankr.S.D.Ohio 1992) (holding that *"United Trucking* should be limited to fact patterns of a similarly egregious nature").

Based on its analysis of the circumstances existing in this case, the bankruptcy court properly exercised its discretion in denying administrative expense priority to Beneke's claim for postpetition fees. To the extent Beneke's argument raises a question of incorrect interpretation of Code § 503, we find no error by the bankruptcy court.

## V. CONCLUSION

The bankruptcy court's order reducing Beneke's unsecured claim by amounts representing fees billed by its clerical staff and holding that Beneke's claim for postpetition fees arising from prepetition contractual obligations were not administrative priority expenses pursuant to 11 U.S.C. § 503(b)(1)(A) is **AFFIRMED**.